TIPTON *v.* STATE.

4463 204 S. W. 2d 552

Opinion delivered September 29, 1947.

Rehearing denied October 27, 1947.

*Reuben Chenowith,* for appellant.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Leo Tipton was convicted of arson and sentenced to serve a year in the penitentiary. In appealing he contends that the judgment should be reversed because (a) the Prosecuting Attorney was erroneously permitted to ask leading questions of State witnesses, (b) testimony of Leamon Dollar should have been rejected because he did not understand the nature of an oath, (c) it was improper for the State to

impeach the testimony of Mrs. Clyde Tipton, and (d) the defendant's requested Instruction No. 2 should have been given.[1]

Herman Stump, 33 years of age, owned a home in Russellville, with outbuildings, including a barn. A $2,000 policy of insurance was issued July 13, 1946, on the residence, but the contract provided that a sum not in excess of ten per cent. of the principal would extend as coverage to secondary structures, provided value equaled that amount. The barn was destroyed by fire December 18th and the following day appellant was arrested.

Leamon Dollar, whose use as a State witness is questioned, was 22 years of age and lived with his father, William Morgan Dollar. Tipton, according to Leamon, called at the Dollar home about seven o'clock the night of December 18th. The two drove for a short time in a truck and Tipton told Leamon he "had a barn to burn." Leamon was invited to join the enterprise, but declined. However, he admitted going with Tipton to a point near the Stump home, where the truck was parked. Tipton went into the barn, used a match to ignite some hay, then withdrew. Leamon had remained outside.

We do not think the questions complained of as leading are open to that objection. When asked by the Prosecuting Attorney "Where were you the first time you saw [Tipton] that night" the witness seemingly did not understand, and said, "That night he came up there?" The defendant's attorney interposed the remark, "I object to putting the answer into his mouth." Context of the examination does not show there was any prompting here.

Later, when Leamon was asked what time Tipton reached the Dollar home the night of December 18th and replied that it was about seven o'clock, appellant objected to the clarifying inquiry, "Was it after dark?" The next question was, "What did Leo [Tipton] want?", and again

---

[1] The instruction would have told the jury that "The information filed [against Tipton] is of itself a mere formal accusation . . . and is not of itself any evidence of the defendant's guilt, and no juror should permit himself to be, to any extent, influenced against the defendant because . . . of the information."

it was complained that the witness was being led. There were other questions and objections of a somewhat similar nature. None shows an intent to improperly develop the case.

Leamon was asked if he knew the meaning of an oath and replied, "Yes, I know some of it." This occurred on cross-examination conducted by the defendant's attorney, who continued to ask questions, some of which related to matters not touched by the Prosecuting Attorney. It was not until additional testimony had been given on redirect examination that appellant's attorney moved to have the jury directed to disregard all of Leamon's testimony because of the so-called infirmity of understanding. The Court properly ruled otherwise. Even if the defendant had not used the witness as his own by bringing in new matter on cross-examination, there was not sufficient showing of statutory disqualification in the answer by Leamon that, as to an oath, he knew the meaning of part of it. He might have understood all of the requisites. We cannot tell what the witness meant by his answer, and therefore must hold that the objection was waived.

Mrs. Clyde Tipton, the defendant's step-mother, testified that she was at home the night of December 18th and the accused did not leave the house. After the State had rested its case and the defendant's witnesses had been examined, Mrs. Tipton was recalled and was asked whether, shortly after the fire, certain officers came to her home to ask about it. When she replied in the affirmative the questions were asked, "Did you tell them that on the night of the fire Leo had borrowed Herman Stump's pickup truck and had gone to town?" And again, "Did you tell either of the officers that the only time Herman Stump left your home was when he went to look for Leo?" A negative answer was given to each question. Two witnesses were permitted to impeach Mrs. Tipton by testifying that she had made contradictory statements— that is, statements at variance with her testimony given on recall.

Appellant thinks the jury may have believed that the impeaching testimony was direct evidence, hence inadmissible for that purpose and prejudicial. The only purpose in recalling Mrs. Tipton and then having witnesses testify she had made contradictory statements was so obviously a test of verity or veracity that it is difficult to see how the jury could have been misled.

It was within the Court's discretion to refuse the defendant's requested Instruction No. 2. By Instruction No. 7 the jury was told that ''The defendant starts out at the commencement of the trial with the presumption of innocence in his favor, and this presumption follows him throughout the trial, or until the evidence convinces you of his guilt beyond a reasonable doubt.'' This was sufficient.

Evidence was ample to warrant conviction. The defendant, in the presence of officers (including a deputy fire marshal) confessed he had burned the structure and said ten dollars was to have been paid him by Stump. There was testimony Stump was seen handing the defendant five dollars. He was overheard to say it was ''to apply on that job.'' A nightwatchman saw Tipton and Dollar the night of December 18th. Tipton was running, and when questioned merely said, ''I am just running.'' The time was 9:15. The watchman saw another boy, later identified as Dollar. He, also, was running and would not explain his hurry. Other witnesses testified to statements or admissions sustaining the State's case.

Appellant undertook to repudiate his confession, asserting he had been promised a suspended sentence. He also insisted that veiled threats had been made by the officers. The confession was submitted to the jury under proper instructions and it had a right to believe or disbelieve what the defendant was alleged to have said, and to reject his alibi.

Affirmed.